No. 82-148

IN THE SUPREME COURT OF THE STATE OF MONTANA

1982

CAROLYN W. BEST,

        Petitioner and Respondent,

  -vs-

WILLIAM BEST,

        Respondent and Appellant.

Appeal from: District Court of the Fourth Judicial District,
In and for the County of Missoula, The Honorable
John S. Henson, Judge presiding.

Counsel of Record:

    For Appellant:

        Patterson, Marsillo, Tornabene & Schuyler, Missoula,
        Montana

    For Respondent:

        Victor F. Valgenti, Missoula, Montana

Submitted on Briefs: October 14, 1982

Decided: December 29, 1982

Filed: DEC 29 1982

_Thomas J. Kearney_
Clerk

Mr. Chief Justice Frank I. Haswell delivered the Opinion of the Court.

On January 7, 1982, the Missoula District Court set aside the marital and property settlement agreement executed by the parties. Husband appeals.

Husband and wife were married in Mississippi in 1957 and spent most of the twenty-two years of their married life in North Carolina, where husband practiced orthopedic surgery. Wife worked for a short time before their marriage as a secretary. The couple moved to the Missoula area with their seven children in 1973 and subsequently acquired some ranch property in the Nine Mile area west of Missoula. Husband did not practice medicine after the move to Montana.

In June 1978, husband contacted his Missoula attorney who prepared an agreement in anticipation of divorce. The agreement provided that wife was to receive mineral rights to the Nine Mile property, a late model vehicle, a parcel of land in North Carolina, and her personal effects. Husband would then pay her $20,000 cash and would make maintenance payments of $800 per month for a year, then $500 per month for two years. He would retain all other property and custody of the children. Wife would have liberal and unlimited visitation rights.

The couple had been having marital difficulties which continued after execution of the agreement. They underwent marital counseling until January 1979, when husband refused to participate further in the sessions and announced that he was proceeding with a dissolution. He made numerous representations to wife that this would be a way to work out the marital difficulties and that she would be taken care of regardless of the specific terms of the dissolution decree.

-2-

Husband again contacted Attorney 1 and both parties conferred with him. A marital and property settlement agreement was prepared that superseded the agreement in anticipation of divorce. Attorney 1 felt it would be appropriate for wife to be advised by separate counsel. He referred her to a second Missoula attorney and made the initial phone call to Attorney 2. At her meeting with Attorney 2, wife was accompanied by husband. Husband dominated the conversation, argued with Attorney 2 over the role the lawyer should play in the dissolution, and objected to Attorney 2's attempts to acquire information about the couple's assets. Wife was completely distraught and was unable to communicate with Attorney 2 at this meeting. No disclosure of assets was made other than statements by husband that the couple owned land near Nine Mile and had some land in North Carolina. Attorney 2 advised wife that it was necessary to do a thorough background investigation to fully determine the couple's assets before he could recommend that she sign the marital and property settlement agreement. He ended the meeting when it became apparent that he would be unable to effectively represent wife's interests with husband present. Attorney 2 set up a second appointment with wife, but it was later cancelled.

On May 7, 1979, the parties executed the marital and property settlement agreement prepared by Attorney 1. Wife was to receive a late model automobile, her personal effects, and monthly payments of $1,000 for the first year ($500 if employed), $750 for the second year ($350 if employed), $500 for the third year ($200 if employed), and $200 per month for the remainder of her life or until

remarriage. Husband retained all other real and personal property. Wife actually received a 1972 automobile and has had difficulty in obtaining some personal effects from husband.

On November 15, 1979, wife moved to set aside the property settlement and the case was tried before the District Court. The District Court set aside the marital and property settlement agreement based upon fraudulent misrepresentations husband made to wife regarding the parties' financial status, concealment of assets or financial condition from the court, and the inequity in apportionment of the parties' assets.

Husband presents two issues on appeal:

1. Whether the District Court erred in setting aside the property settlement agreement; and

2. Whether the property settlement agreement was inequitable and unconscionable.

Husband argues, first, that there is not substantial evidence to support a finding that he either materially misrepresented or concealed assets or financial condition; that wife was at all times in a position to discover any information she desired concerning the finances of the marriage; and that wife was not under stress of such magnitude that it deprived her of her capacity to reason and fully understand and appreciate the legally binding nature of the agreement. Therefore, he contends that the District Court erred in setting aside the property settlement. We disagree.

The record provides ample evidence to support the District Court's findings that husband made fraudulent misrepresentations to wife with regard to the finality of

the dissolution and the financial status of the marriage and to support a finding that he concealed assets from both wife and the court. Further, the record demonstrates that wife did not have ready access to information on their financial condition at the time of the dissolution. Finally, the record shows that wife was under extreme stress, visible to both Attorneys 1 and 2, at the time the marital and property settlement agreement was prepared.

During the course of the parties' marriage, they acquired considerable assets. These assets included property held by Genron Corporation in North Carolina, the Nine Mile property, a house on Queen Street in Missoula, a substantial amount of gold and silver coins and bouillion held in Swiss and London bank accounts, and gold and silver coins secreted in the Queen Street residence. While they lived in North Carolina until shortly after they moved to Missoula, wife was involved in the family's financial planning and management. Although an honors graduate of the University of Mississippi, wife did not work outside the home during the marriage, though she did help manage some of the North Carolina rental property held by Genron Corporation. She collected rents, did some bookkeeping, and handled some administrative details for the property. Primarily, however, she was involved in raising the couple's seven children. Sometime before the move to Montana, based on wife's research, husband and wife decided together to invest in gold and silver. Accounts were opened in two Swiss banks and a London bank for that purpose.

After the move to Montana, however, husband gradually but effectively assumed complete control of the family's

finances. Wife knew of the existence of some parcels of real estate, but was not aware of the debt structure on the property. For two or three years prior to the dissolution, wife had no access to either the Swiss or Missoula bank accounts. When she asked about the Swiss accounts, husband led wife to believe that they had been depleted for living expenses. For the last year of the marriage, wife was completely excluded from all financial affairs to the point that she was not allowed to have her own personal checkbook or to write checks on any family account.

Sometime during 1978, approximately $250,000 worth of gold and silver coins mysteriously disappeared from the family home. While some of the children knew where part of the coins were stored, only husband and wife knew where the bulk of the coins were hidden. Husband convinced wife that it would be futile to notify the authorities of the disappearance since they could not give even a rough estimate of when the coins were taken and he stated that, "I really think the children are better off without all that money."

Unknown to wife, husband filed a financial statement in 1978 with a Missoula bank. The statement disclosed assets of $804,500 with no liabilities existing against the assets. A second statement was filed in 1980 that showed the value of the assets to be $883,000. Neither statement included reference to the gold or silver holdings in London or in Switzerland.

Throughout the period preceding the dissolution, as the marital and property settlement agreement was being prepared, husband represented to wife that she and the children would always be well taken care of but that he did

not want to be tied to a specific dollar amount due them. He further induced her to believe that the gold and silver coins were dissipated, that it was necessary for him to retain the remaining real property in order to support and educate the children, and that the divorce and property settlement were temporary in nature until the parties could work out the problems between them.

In September 1979 the parties' oldest son returned to Missoula from California, where he had been attending school. Although it was planned that he was to stay with his father in the family home, he found on arrival that no arrangements had been made for him and he stayed with his mother. On several occasions he went to the family home to search for personal belongings that had been removed from his former room. Some of the items were packed and removed from the house for storage. Some he found scattered about the house. In looking for these items, he entered his father's room to check boxes in the closet. He discovered bank statements from the Swiss bank accounts that showed a balance in excess of $300,000 worth of gold coins on deposit shortly before the dissolution. The statements were addressed to a post office box in Huson, Montana, which is near the Nine Mile property. The son also discovered a will executed by husband within a month after he signed the property agreement, which excluded his eldest son and his third son from the will. Husband had at that time also refused to pay the college expenses of his third son.

Wife moved to set aside the property settlement agreement on the basis of fraudulent misrepresentations by husband as to the extent of property held by the parties;

-7-

the finality of the dissolution; his willingness to support and educate the children and to pass proportionate shares of the family estate to each child and to wife; and his willingness to take care of wife financially. She also prayed for relief based upon the inequity of the property division considering the value of their property and the employable skills possessed by each party.

This Court has long recognized that it is the rule that a judgment must be regarded as final and conclusive unless it is shown that a party, by extrinsic or collateral fraud, has prevented a fair submission of the matter. Hall v. Hall (1924), 70 Mont. 460, 467-468, 226 P. 469, 471. A court of equity's power to set aside a decree obtained by such fraud is inherent. Pilati v. Pilati (1979), ____ Mont. ____, 592 P.2d 1374, 36 St.Rep. 619, 625. Extrinsic fraud may consist of a deception practiced by a party in keeping another party in ignorance. Pilati, 592 P.2d at 1380, 36 St.Rep. at 627. See also, Bates v. Bates (1965), 1 Ariz.App. 165, 400 P.2d 593, 596.

Husband attempts to distinguish the case at hand from Pilati. In Pilati the wife was married at sixteen years of age to a thirty-five-year-old; she had only a ninth grade education while her husband held both bachelor's and master's degrees, and had worked toward both a Ph.D. and a J.D.; he was a high school teacher and real estate appraiser and he handled all of the family finances to the extent that he even purchased all groceries and clothing. We held the concealment of marital assets by the husband in Pilati to constitute fraud requiring reversal. Pilati is directly in point with the case before this Court.

-8-

While wife had a college education, she had not worked outside the home. The financial transactions she had been regularly involved with were gradually but completely taken away from her. She was excluded from all of the family's financial dealings and was not even allowed to write checks on a personal account. Husband falsely misrepresented to wife that the Swiss accounts had been depleted and that he would need to retain the remainder of the property to support and educate the children. He represented to her that she and the children would be supported, that they would be left in husband's will, and that the dissolution was temporary in nature. Wife did not know the extent of the family financial assets when the agreement was signed. Upon discovery of the concealment, she acted in a timely manner to assert her rights.

The District Court found that wife was under duress at the time that the agreement was entered and that Attorneys 1 and 2 both observed her stress. It found, however, that she was under no more stress at that time than is considered normal under the given circumstances.

Husband relies on this Court's holding in Hadford v. Hadford (1981), _____ Mont. _____, 633 P.2d 1181, 1182, 38 St.Rep. 1308, 1309. Hadford is clearly distinguishable. There both husband and wife were represented by independent counsel. The assets were evenly divided. Wife moved to set aside the agreement after nearly five years. Her grounds seemed to be unconscionability and fraud. No evidence supporting fraud was introduced. Nor was evidence of unconscionability presented. Her evidence instead was focused on the fact that the expenses of operating the

laundromat she received in the property division were more than she had anticipated.

Here, wife and husband were both represented by husband's attorney and husband had concealed substantial assets. Husband's behavior since wife moved to set aside the agreement ratifies the District Court's finding of fraud. Husband has attempted to reconcile with wife but a final reconciliation has always been conditioned upon the action being dropped. Husband has maintained a "lack of memory" on the status of the Swiss bank accounts, yet has refused to sign a release to allow the District Court to view records which would clarify the transactions. Husband did liquidate the silver holdings from the London account and received over $35,000 in the transaction.

The record also shows that wife was under extreme stress and was even characterized by Attorney 2 as "completely out of control." Without the guidance of the independent counsel such as that relied upon by the wife in Hadford, and relying upon the constant misrepresentations made by husband, wife could not freely enter into the property settlement agreement even though she appeared to Attorney 1 to be rational and aware of what she was doing in spite of the stress she was under. The District Court acted properly in setting aside the property agreement.

Husband argues, second, that the property settlement was both equitable and conscionable under the circumstances. He contends that wife refused separate counsel and that she did not want more property than that listed in the agreement. He argues further that property settlements which are knowingly and voluntarily entered should be upheld. Finally,

he contends that a mere inequality in distribution of marital property does not render an agreement unconscionable. Again, we reject his argument.

Husband's first contention is based upon wife's refusal to seek separate counsel and the fact that she was advised by counsel when the agreement was entered. That argument is premised upon a full and open accounting of the finances of the marriage and wife's desire to ensure that husband could adequately care for the children. It fails. Husband made material misrepresentations which she relied upon. The District Court found that those misrepresentations alone resulted in an unconscionable and inequitable property division. The record supports that finding. Nor could wife knowingly and voluntarily enter an agreement founded upon such gross misrepresentations.

Husband finally attempts to argue that mere inequality in the property division does not justify vacating that agreement. He relies upon Lawrence v. Lawrence (1982), ____ Mont. ____, 642 P.2d 1043, 39 St.Rep. 548. There, wife received approximately $60,000 while husband received approximately $400,000. The wife in Lawrence was represented by competent, knowledgeable, and independent counsel; she entered the agreement with a fairly complete knowledge of the assets; and she refused to act despite advice that she could receive more property if she so desired.

Here, again, wife did not receive independent counsel and did not have a complete knowledge of the concealed assets. Moreover, she did not receive even a fraction of the marital estate. Wife received only her personal effects, a 1972 automobile, and a decreasing scale of

maintenance payments that provided only $200 per month by June 1982. She had only secretarial skills which had not been used in over twenty-two years with which to support herself. Husband was left with property that conservatively can be estimated in excess of $1,000,000. His representations that he would support and educate the children and ensure that both they and wife received an appropriate portion of the family estate have remained unfulfilled. The District Court's finding that the property settlement agreement was unconscionable and inequitable is supported by substantial credible evidence. This Court will not substitute its judgment for that of the trial court, which had the opportunity to observe the demeanor and candor of the witnesses. Husband has failed to demonstrate a clear preponderance of the evidence against the decision of the trial court. Tweeten v. Tweeten (1977), 172 Mont. 404, 406-407, 631 P.2d 1141, 1143.

Affirmed.

_____
Chief Justice

We concur:

_____

_____

_____

_____
Justices

-12-